**Not for Publication**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| MAQSOOD THANGE,<br><br>                 **Plaintiff,**<br><br>        v.<br><br>OXFORD GLOBAL RESOURCES, LLC,<br>ATLANTIC HEALTH SYSTEMS, INC.,<br>JEFF ADKINS, and DEBBIE KING,<br><br>                 **Defendants.** | Civil Action No.: 19-5979 (ES) (JRA)<br><br>OPINION |

**SALAS, DISTRICT JUDGE**

Before the Court are Defendants Oxford Global Resources, LLC ("Oxford"), Atlantic Health Systems, Inc. ("Atlantic"), and Debbie King's motions for summary judgment pursuant to Federal Rule of Civil Procedure 56. (D.E. Nos. 49 & 50). Having considered the parties' submissions, the Court decides this matter without oral argument. *See* Fed. R. Civ. P. 78(b); L. Civ. R. 78.1(b). As set forth below, Oxford's motion is GRANTED and Atlantic and King's motion is GRANTED in-part and DENIED in-part.

## I.    BACKGROUND[1]

Plaintiff, an Indian man of Islamic faith, has worked on and off for Oxford as a PeopleSoft software consultant for over twenty years. (Ox. SUMF ¶ 5). Oxford is a temporary staffing agency

---

[1]    The relevant facts are summarized from Defendants' statements of undisputed material facts. (D.E. Nos. 49-19 ("Ox. SUMF") & 50-1 ("Atl. & King SUMF")). The Court has extracted facts that are undisputed and notes all relevant disputes.

that provides various technical services to clients.  (D.E. No. 49-1 ("Ox. Mov. Br.") at 1).  One

such client is Atlantic.  (Ox. SUMF ¶ 1).  In early 2018, Atlantic requested that Oxford provide

candidates who specialized in PeopleSoft software for a temporary position to aid a team.  (*Id.*).

Oxford shared the opportunity with Plaintiff, who interviewed with Atlantic and was selected for

the position in February of that year.  (*Id.* ¶ 8).  Plaintiff then entered into a consultant agreement

with Oxford.  (*Id.* ¶ 9; D.E. No. 49-8, Ex. F to McLane Cert. ("Consultant Agreement")).  The

Consultant Agreement states, in pertinent part:

> Consultant understands that he/she shall be an employee of Oxford
> while on any assignment and shall be responsible to advise Oxford
> promptly of any problems, complaints, legal issues, or questions that
> Consultant has concerning his/her employment, status or work
> treatment while on any such assignment. The Employee shall remain
> an employee of Oxford at all times and acknowledges and agrees
> that he/she is not an employee of any Client.

(Ox. SUMF ¶ 14; Consultant Agreement ¶ 4).

The Consultant Agreement also provides that the "Consultant understands that the length

of any assignment may be terminated at will by [Atlantic]."  (Ox. SUMF ¶ 12; Consultant

Agreement ¶ 3).  Plaintiff's assignment at Atlantic was for a period of three months.  (Ox. SUMF

¶ 11; D.E. No. 49-3, Ex. A to McLane Cert.).

In addition, Oxford and Atlantic had previously entered into a Master Consulting Services

Agreement with an Independent Contractor clause that states:

> This Agreement does not create any agency relationship between
> Oxford, Consultant and/or [Atlantic], and both parties are acting
> hereunder as independent contractors. No relationship of
> employer/employee between Client and Oxford staff is created by
> this Agreement. Each party will be solely and entirely responsible
> for its acts and for the acts and omissions of its agents, employees
> and permitted subcontractors (if any) during the performance of this
> Agreement. Neither party grants the other any right to bind it except
> as otherwise expressly agreed in writing. Each party shall be fully
> liable for all workers' compensation premiums and liability

insurance, federal, state and local withholding taxes or charges with
respect to its respective employees.

(Atl. & King SUMF ¶¶ 5 & 7; D.E. No. 62, Ex. 15 ("Master Agreement") ¶ 7).

At Atlantic, Plaintiff joined a team that included Jeff Adkins, who was also on assignment
as an Oxford PeopleSoft consultant. (Ox. SUMF ¶ 24). King, an Atlantic manager, supervised
Plaintiff and oversaw his day-to-day activities. (Atl. & King SUMF ¶¶ 13 & 20). Plaintiff
maintains that he was subjected to a hostile work environment based on his race/national origin
(Indian) and religion (Islam). (D.E. No. 17 ("Am. Compl.") ¶ 27; D.E. No. 52-2 ("Pl. CSUMF")
¶ 1).

The crux of Plaintiff's allegations involves several alleged discriminatory comments
Adkins made towards him in March and April of 2018. For example, while having lunch one day,
Adkins allegedly asked him, "Oh, are you hiding a bomb?" (Pl. CSUMF ¶ 13; *see id.* ¶ 8). On
two other occasions, Plaintiff asserts that Adkins called him a "jihadi" and asked, "[a]re you a
jihadist?" (*Id.* ¶¶ 8, 14 & 16). The latter occasion allegedly occurred in front of King, who Plaintiff
claims smirked and said nothing in response to hearing the comment. (*Id.* ¶ 17). Plaintiff also
alleges that Adkins told him to "shut up," "be quiet," and informed him that "no one wants to know
what you have to say" and that "nobody's listening (to you)." (*Id.* ¶¶ 8 & 24). On several occasions
Plaintiff states that Adkins told him "[w]e don't understand your accent" and "[w]e don't
understand what you have to say." (*Id.* ¶¶ 8 & 15). Plaintiff maintains that these comments were
regularly made at meetings with Atlantic employees and supervisors. (*Id.* ¶ 26). Moreover,
Plaintiff claims that these comments were directed at him—no one else—because of his religion,
race, and national origin. (*See id.* ¶ 27). Plaintiff asserts that he complained to Oxford recruiter
Larissa Kaderavek regarding Adkins's comments on at least one occasion and maintains that

neither Oxford nor Atlantic took corrective action.  (*Id.* ¶¶ 28–29).[2]

Meanwhile, Atlantic allegedly received numerous complaints from customers and coworkers regarding Plaintiff's performance and had begun searching for a replacement.  (Atl. & King SUMF ¶ 25).  For example, King testified that she witnessed Plaintiff making inappropriate comments to customers, and that she had received complaints from an "internal HR customer" who commented that Plaintiff would "repeatedly ask[] the same questions that were given answers to already."  (D.E. No. 50-5, Ex. 4 to Ritardi Cert. ("King Dep.") at 47:3–49:1).  One of Plaintiff's co-workers also affirmed that she complained to King because he was "extremely talkative and counterproductive" and "spent far too much time talking about non-work-related matters."  (D.E. No. 61, Ex. 27 to Ritardi Cert. ("Ishaque Aff.") ¶ 14).

On March 28, 2018, Oxford executive Jordan Sims emailed King to ask how Oxford's consultants were doing.  (D.E. No. 61, Ex. 21 to Ritardi Cert.).  Two days later, Sims summarized his conversation with King in an internal email: "[Plaintiff] is not what [King] needs. [S]he has gotten a lot of negative feedback from the HR customers about him. [S]he wants us to backfill." (D.E. No. 50-5, Ex. 10 to Ritardi Cert.).  On April 4, King and Sims exchanged emails discussing a replacement candidate.  (D.E. No. 61, Ex. 22 to Ritardi Cert.).  Two days later, King interviewed Oxford's proposed replacement candidate.  (*Id.*).  On April 9, Sims sent another email recapping a conversation with King: "[Plaintiff] has a test file due on Wednesday. [King] doesn't have confidence that he's going to get it done. [I]t takes him a really long time to get things done." (D.E. No. 50-5, Ex. 10 to Ritardi Cert.).  The email continued: "[Plaintiff] gets easily distracted.

---

[2]    Defendants dispute whether Adkins made these alleged comments, Plaintiff's reporting of Adkins's comments, and King's purported knowledge of the same.  Kaderavek testified that Plaintiff never complained to her about anything out of the ordinary regarding Adkins, discrimination, or Atlantic in general.  (D.E. No. 49-5, Ex. C at 15:17–16:15).

Jeff will do extra things on his own time and goes above and beyond. [Plaintiff] isn't like that and she thinks he's really milking for time." (*Id.*).

On April 10, King met with Plaintiff to express her disappointment with his work. (Am. Compl. ¶ 35; Atl. & King SUMF ¶ 25). Unbeknownst to King, Plaintiff surreptitiously recorded the meeting. (*See generally* D.E. No. 61, Ex. 23 to Ritardi Cert.). During the meeting, King told Plaintiff she had been getting complaints from customers and that he needed to be careful about how he was speaking to them. (*Id.* at 7:2–15). The next day, King sent Sims the following email: "As far as [Plaintiff] he is really not a fit here and I spoke to him about a few things yesterday." (Atl. & King SUMF ¶ 25; D.E. No. 61, Ex. 24 to Ritardi Cert.).

On April 12, King again met with Plaintiff to tell him it was his last day on assignment. (Atl. & King SUMF ¶ 25). Again, Plaintiff secretly recorded the meeting. (*See generally* D.E. No. 61, Ex. 25 to Ritardi Cert.). Upon being told it was his last day, Plaintiff asked whether it was because "[Adkins has] been calling me names." (*Id.* at 2:8–22). King denied any knowledge of Adkins's comments and informed Plaintiff that she had been getting complaints from customers and felt he was unproductive. (*Id.* at 3:3–6:17).

On June 20, 2019, Plaintiff filed a six-count Amended Complaint alleging race, religion, and national origin-based discrimination and retaliation claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* (Counts I and II against Oxford and Atlantic), 42 U.S.C. § 1981 (Count III against all Defendants), and the New Jersey Law Against Discrimination ("NJLAD"), § 10:5-1 *et seq.* (Counts IV–VI against all Defendants). (Am. Compl. ¶¶ 54–83).[3]

On September 3, 2021, Defendants moved for summary judgment on all counts. (D.E. Nos. 49 & 50). The motions are fully briefed. (Ox. Mov. Br.; D.E. No. 50-2 ("Atl. & King Mov.

---

[3]      Although Plaintiff also filed the action against Adkins, he never served him. (Ox. Mov. Br. at 1 n.1; *see* Atl. & King SUMF ¶ 49). Thus, the Defendants are Oxford, Atlantic, and King.

Br."); D.E. No. 52 ("Opp. Br."); D.E. No. 55 ("Ox. Reply"); D.E. No. 56 ("Atl. & King Reply")).

## II.   LEGAL STANDARD

Summary judgment is appropriate "if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists when—in viewing the evidence and all reasonable inferences drawn from it in the light most favorable to the non-movant—a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. *Id.* at 249.

The movant bears the burden of establishing that no genuine issue of fact exists. *Aman v. Cort Furniture Rental Cop.*, 85 F.3d 1074, 1080 (3d Cir. 1996). This burden is satisfied by "produc[ing] evidence showing the absence of a genuine issue of material fact" or, if the nonmovant bears the burden of proof at trial, by showing "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

If the party seeking summary judgment makes this showing, it is left to the nonmoving party to "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, to survive summary judgment, the nonmoving party must "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. Furthermore, "[w]hen opposing summary judgment, the nonmovant may not rest upon mere allegations, but rather must 'identify those facts of record which would contradict the facts identified by the movant.'" *Corliss v. Varner*, 247 F. App'x 353, 354 (3d Cir. 2002) (quoting *Port Auth. of N.Y. and N.J. v. Affiliated FM Ins. Co.*, 311

6

F.3d 226, 233 (3d Cir. 2002)).

## III.    DISCUSSION

### A.    Atlantic is Plaintiff's Joint Employer

As a preliminary matter, Atlantic disputes Plaintiff's claim that it acted as his "joint employer," arguing instead that Plaintiff was an independent contractor.  (Atl. & King Mov. Br. at 8).  The distinction is critical because to prevail on his Title VII or NJLAD claims as to Atlantic, Plaintiff must demonstrate the existence of an employment relationship.  *Patel v. Cigna Corp.*, No. 02-6141, 2005 WL 1656930, at *3 (D.N.J. July 12, 2005) ("In order to bring a claim under Title VII or NJLAD, a plaintiff must be classified as an 'employee' under the statutory framework."); *Kurdyla v. Pinkerton Sec.*, 197 F.R.D. 128, 132 (D.N.J. 2000) ("The NJLAD protects only employees and does not cover independent contractors."); *Shah v. Wisconsin*, No. 11-0419, 2011 WL 5192127, at *5 (D.N.J. Oct. 31, 2011).

Title VII defines "employee" as "an individual employed by an employer."  42 U.S.C. § 2000(e).  The NJLAD states that an "'employee' does not include any individual employed in the domestic service of any person."  N.J. Stat. Ann. § 10:5-5.  To aid in the interpretation of the NJLAD, state courts have often turned to federal precedent "as a key source of interpretive authority."  *Patel*, 2005 WL 1656930, at *3 (quoting *DaBronzo v. Roche Vitamins, Inc.*, 232 F. Supp. 2d 306, 314 (D.N.J. 2002)).

Under federal law, common-law agency principles control whether someone is an employee.  *See Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 322–23 (1992); *Walters v. Metro. Educ. Enters., Inc.*, 519 U.S. 202, 211–12 (1997); *Shah v. Bank of Am.*, 346 F. App'x 831, 833 (3d Cir. 2009) ("[I]n order to determine whether a person is an employee for purposes of Title VII, the common law of agency and the traditional master-servant doctrine applies.").  To

determine whether a hired party is an employee under common law agency principles, an important

consideration is "the hiring party's right to control the manner and means by which the product is

accomplished." *Darden*, 503 U.S. at 323 (quoting *Cmty. for Creative Non–Violence v. Reid*, 490

U.S. 730, 739–40 (1989)).  Other factors include:

> the skill required; the source of the instrumentalities and tools; the
> location of the work; the duration of the relationship between the
> parties; whether the hiring party has the right to assign additional
> projects to the hired party; the extent of the hired party's discretion
> over when and how long to work; the method of payment; the hired
> party's role in hiring and paying assistants; whether the work is part
> of the regular business of the hiring party; whether the hiring party
> is in business; the provision of employee benefits; and the tax
> treatment of the hired party.

*Id.* at 323–24.

While "all of the incidents of the relationship must be assessed and weighed with no one

factor being decisive," *id.* at 324, the Third Circuit has generally focused on (i) who paid the

individual's salary; (ii) who hired and fired him; and (iii) who had control over his daily

employment activities, *Faush v. Tuesday Morning, Inc.*, 808 F. 3d 208, 214 (3d Cir. 2015) (citing

*Covington v. Int'l Ass'n of Approved Basketball Officials*, 710 F.3d 114, 119 (3d Cir. 2013)).

Moreover, two different entities can simultaneously be "joint employers" of an individual.  *Graves

v. Lowery*, 117 F.3d 723, 727 (3d Cir. 1997).

A reasonable jury may find that Plaintiff functioned as Atlantic's employee rather than as

an independent contractor.  Plaintiff argues that his role was that of an employee because he

"work[ed] at Atlantic's office location, alongside Atlantic employees, managed by Atlantic

supervisors, and deal[t] directly with Atlantic's employees and customers."  (Opp. Br. at 27).  As

to these arguments, Atlantic only disputes that it supervised Plaintiff's daily activities.  (Atl. &

King Reply at 4–5).  In addition, Atlantic argues that Plaintiff was an independent contractor

because (i) Oxford paid Plaintiff and managed his daily activities, (ii) Plaintiff's assignment was to last only three months, and (iii) the Consultant Agreement between Oxford and Plaintiff should control.  (*Id.* at 2–4).

The Consultant Agreement between Oxford and Plaintiff expressly provides that "[Plaintiff] shall remain an employee of Oxford at all times and acknowledges and agrees that he/she is not an employee of any Client . . . ."  (Consultant Agreement ¶ 4).  Similarly, Atlantic's Master Agreement with Oxford explicitly states that Atlantic, Oxford, and Plaintiff are independent contractors.  (Master Agreement ¶ 7).  The Master Agreement also stipulates that Oxford would take legal responsibility for Plaintiff: "Each party shall be fully liable for all workers' compensation premiums and liability insurance, federal, state and local withholding taxes or charges with respect to its respective employees."  (*Id.*).  While the contract language is strong evidence in favor of Plaintiff's status as an independent contractor, it is not dispositive.  *See Brown v. J. Kaz, Inc.*, 581 F.3d 175, 181 (3d Cir. 2009) (first citing *Holtzman v. World Book Co., Inc.*, 174 F. Supp. 2d 251, 256 (E.D. Pa. 2001); and then citing *Adcock v. Chrysler Corp.*, 166 F.3d 1290, 1293 (9th Cir. 1999)).

The Third Circuit's three primary factors tend to favor Plaintiff's status as an employee. As to Plaintiff's compensation, the Court finds this case analogous to *Faush*.  There, the Third Circuit held that although the contracting company made its payments to the staffing agency—that in turn paid the temporary employee's wages—"those payments were functionally indistinguishable from direct employee compensation."  808 F.3d at 215–16.  "[R]ather than paying [the staffing agency] a fixed rate for the completion of a discrete project, 'a method by which independent contractors are often compensated,' [the contracting company] paid [the staffing agency] for each hour worked by each individual temporary employee at an agreed-upon

hourly rate." *Id.* at 216 (quoting *Reid*, 490 U.S. at 752). Likewise, while Oxford paid Plaintiff's wages directly, Atlantic paid Oxford "based on timesheets documenting the hours worked by [Plaintiff]" at an agreed-upon hourly rate, rather than paying Oxford a fixed rate for the completion of a discrete project. (Master Agreement ¶ 2).

The factors regarding Plaintiff's hiring and firing support his position as well. Again, *Faush* is instructive. There, as here, while the contracting company did not hire the plaintiff or have the power to terminate his employment with the staffing agency, it had ultimate control over whether he was permitted to work at its company. *See Faush*, 808 F.3d at 216. In *Faush*, the Third Circuit noted that "[i]f [the contracting company] was unhappy with any temporary employee for any reason, it had the power to demand a replacement from [the staffing agency] and to prevent the ejected employee from returning to the store." *Id.* As Atlantic itself notes, while it "did not and could not terminate Plaintiff's employment with Oxford," it could, under the Master Agreement "request that Oxford remove and/or replace any consultant, which it did." (Atl. & King Mov. Br. at 11). King, moreover, admits she had the authority to remove Plaintiff from consulting for Atlantic. (King Dep. at 40:22–25).

Finally, facts concerning Plaintiff's daily activities also support his employment status. For example, he worked out of Atlantic's office and was presumably provided with the means to perform his job. (Am. Compl. ¶ 19; Master Agreement ¶ 1). And while the parties dispute who oversaw his daily activities, the Statement of Services attached to the Master Agreement expressly designates King as Client Manager and provides that "[t]he Client Manager shall have overall responsibility for directing and managing the Services performed [by Plaintiff]." (D.E. No. 61, Ex. 17 to Ritardi Certi. ¶ 4). King concedes she had supervisory authority over Plaintiff during his time at Atlantic, including the authority to assign him tasks. (King Dep. at 38:18–24).

10

"When a legal standard requires the balancing of multiple factors . . . summary judgment may still be appropriate even if not all of the factors favor one party, so long as the evidence so favors the movant that no reasonable juror could render a verdict against it." *Faush*, 808 F.3d at 215 (internal quotations and citations omitted). Although the contract language is strong evidence that Plaintiff is an independent contractor, the *Faush* factors support his status as an employee. Thus, a reasonable jury could find the existence of an employment relationship between Plaintiff and Atlantic.

**B.   Hostile Work Environment Claims: Count I (Title VII), Count III (Section 1981), and Counts IV & VI (NJLAD)**

*i.   Counts I, III, and IV against Oxford & Atlantic*

Under Title VII, "[i]t shall be an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Title VII prohibits harassment that is "sufficiently severe or pervasive enough to alter the conditions of [the plaintiff's] employment and create an abusive working environment." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986). To prove a *prima facie* claim for hostile work environment under Title VII, a plaintiff must show (i) he suffered intentional discrimination because of his status in a protected class; (ii) the discrimination was severe or pervasive; (iii) the discrimination detrimentally affected him; (iv) the discrimination would detrimentally affect a reasonable person in like circumstances; and (v) the existence of *respondeat superior* liability." *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013); *Dey v. Innodata Inc.*, No. 18-0978, 2022 WL 596977, at *5 (D.N.J. Feb. 24, 2022) (listing Title VII hostile work environment elements). "The first four elements establish a hostile work environment, and the fifth element determines employer

liability." *Mandel*, 706 F.3d at 167.  "As a general matter, the same basic principles apply when evaluating [p]laintiff's claims under [Title VII and the NJLAD]." *Hargrave v. County of Atlantic*, 262 F. Supp. 393, 410 (D.N.J. 2003); *Ali v. Woodbridge Twp. Sch. Dist.*, 957 F.3d 174, 181 (3d Cir. 2020).[4]  In addition, Plaintiff's "harassment claim under § 1981 alleg[ing] a hostile work environment on the basis of race" is governed by the same elements. *Castleberry v. STI Grp.*, 863 F.3d 259, 263 (3d Cir. 2017); *Emery v. Uber Techs., Inc.*, No. 20-5156, 2021 WL 941879, at \*6 (D.N.J. Mar. 12, 2021) ("Although the rights guaranteed by [Section] 1981 and Title VII are separate, distinct, and independent, a hostile work environment claim under Section 1981 is analyzed in the same manner as under Title VII." (cleaned up)).

In Counts I, III, and IV, Plaintiff alleges Title VII, Section 1981, and NJLAD hostile work environment claims based on his race, ethnicity, and national origin.  Oxford and Atlantic move for summary judgment on these claims, arguing that Plaintiff cannot establish that he was subjected to a hostile work environment.  The Court finds that summary judgment is warranted as to Oxford, but not Atlantic. Accordingly, Counts I, III, and IV survive against Atlantic.

As an initial matter, Oxford disputes Plaintiff's version of the facts—such as whether Adkins made any of the alleged comments at all and whether King overheard one instance in which Plaintiff was called a "jihadi."  (*Id.* at 12–13).  In support, Oxford cites the testimony of both Adkins and King denying these allegations.  (D.E. No. 49-12, Ex. J to McLane Cert. at 15:19–21; King Dep. at 24:9–14).  However, the Court must view the record in the light most favorable to the non-moving party; the duty to weigh competing evidence and decide which version of the facts

---

[4]      Under the NJLAD, the New Jersey Supreme Court has "concluded that employers could be vicariously liable in damages under an agency theory for . . . harassment committed by employees, and that such liability would be governed by a variable standard depending on the state of mind of the employer.  Employers that were negligent in failing to take effective steps to end . . . harassment would be liable for compensatory damages, while those that actually participated in or were willfully indifferent to the wrongful conduct would be liable for punitive damages." *Payton v. New Jersey Tpk. Auth.*, 691 A.2d 321, 326 (N.J. 1997) (citing *Lehmann v. Toys 'R' Us, Inc.*, 626 A.2d 445 (1993) (internal citations omitted)).

12

is more credible lies with the jury.  *Brown v. Joel Tanis & Sons, Inc.*, No. 13-2984, 2016 WL 3951378, at *5 (D.N.J. July 21, 2016).

Turning to the first element of the hostile work environment claim, Oxford disputes whether Adkins's alleged comments were motivated by racial animus.  (Ox. Mov. Br. at 12–14).  Specifically, Plaintiff maintains that Adkins asked him whether he was "hiding a bomb," called him a "jihadi," and asked whether he was a "jihadist."  (Pl. CSUMF ¶¶ 8, 13–14 & 16).[5]  According to Plaintiff, Adkins also frequently told him to "shut up" and "be quiet."  (*Id.* ¶ 8).  In addition, Adkins told Plaintiff that "we don't understand your accent," "no body's talking to you," "no body's listening (to you)," "no one wants to know what you have to say," and "we don't understand what you have to say" during team meetings.  (*Id.* ¶¶ 8, 15 & 24).  Finally, a few hours prior to his termination, Adkins allegedly told Plaintiff that "[w]e don't want your kind of people around."  (*Id.* ¶¶ 36 & 40).

Oxford argues that none of these comments, taken in isolation, can be viewed as being motivated by Plaintiff's race, religion, or his national origin.  (Ox. Mov. Br. at 12–14).  The Court disagrees.  The Third Circuit has held that "the advent of more sophisticated and subtle forms of discrimination requires that we analyze the aggregate effect of all evidence and reasonable inferences therefrom, including those concerning incidents of facially neutral mistreatment, in evaluating a hostile work environment claim."  *Dey*, 2022 WL 596977, at *6 (denying summary judgment where the defendant used derogatory racial comments, categorically shut down the plaintiff's suggestions, and repeatedly commented on her inability to understand the plaintiff).  Viewing the record in the aggregate, the Court finds that Plaintiff has demonstrated a genuine issue

---

[5]    Plaintiff's position appears to be that Adkins made these comments once; however, his counter statement of material facts also suggests that they could have been more frequent.  (*Compare* Pl. CSUMF ¶¶ 13–14 & 16, *with id.* ¶ 8).

of material fact as to whether Adkins's comments were motivated by animus based on race, religion, or national origin. Thus, a reasonable factfinder could conclude that all of the alleged mistreatment, including the facially neutral conduct, was related to Plaintiff's race, religion, or national origin. *See Sherrod v. Philadelphia Gas Works*, 57 F. App'x 68, 76 (3d Cir. 2003).

As to the second element, the Court again finds that whether Adkins's comments qualify as severe or pervasive is a question best left for the jury. *See Castleberry*, 863 F.3d at 264 (clarifying that the correct standard is "severe *or* pervasive"). To be severe or pervasive the alleged conduct must be "extreme to amount to a change in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). To determine whether an environment is sufficiently hostile or abusive, "courts look[] at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 787–88 (internal quotations and citations omitted). "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Id.* at 788 (internal quotations and citations omitted). "Severe or pervasive harassment can be distinguished from the 'mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee.'" *Nuness v. Simon and Schuster, Inc.*, 221 F. Supp. 3d 596, 601 (D.N.J. 2016) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)). While the threshold for showing severity and pervasiveness is high, *Greer v. Mondelez Glob., Inc.*, 590 F. App'x 170, 173 (3d Cir. 2014), even one isolated instance can suffice to state a hostile work environment claim if sufficiently severe, *Castleberry*, 863 F.3d at 264.

As set forth *supra*, Plaintiff bases his hostile work environment claims on Adkins's overall treatment of him, including the derogatory comments directed at him during team meetings in which both employees and supervisors were allegedly present.  (Pl. CSUMF ¶¶ 7–8, 13–17 & 24–25).  As to the frequency of this conduct, it necessarily must have occurred sometime between February 12, 2018, and April 12, 2018—from the time Plaintiff began his engagement with Atlantic to his termination.  (Atl. & King SUMF ¶¶ 6 & 25).  By Plaintiff's account, Adkins's conduct occurred "on numerous occasions," "frequently," and "often in front of others."  (Pl. CSUMF ¶¶ 7–9 & 24).  Adkins's alleged comments occurred up until the day Plaintiff was terminated when Adkins told Plaintiff "[w]e don't want your kind of people around," referring to Indian Muslims.  (*Id.* ¶¶ 36 & 40).

Oxford and Atlantic suggest that even if Adkins made the alleged comments, his words are more akin to mere offensive utterances and offhand comments that are not sufficiently severe or pervasive in quantity or nature to meet the standard for actionable harassment.  (Ox. Mov. Br. at 12–16; Alt. & King Mov. Br. at 25–27).  The Court, however, cannot ignore Adkins's facially neutral behavior when considering the severity or pervasiveness of his overall conduct.  Plaintiff argues that Adkins's discriminatory motive is evidenced by the anti-Muslim comments—calling Plaintiff a "jihadi" and asking him whether he is a "jihadist"—and his Islamic terrorism comment—asking Plaintiff whether he was "hiding a bomb."  (Pl. CSUMF ¶ 8; Opp. Br. at 10–13).  And the allegedly discriminatory conduct included not only religious and racial/national origin-based comments, but also repeated minimization.  A reasonable juror could find that Adkins's religious-based comments, when combined with the facially neutral conduct, constituted severe and humiliating conduct and/or pervasive and regular conduct which altered the conditions of Plaintiff's employment.  Accordingly, whether conduct is so severe or pervasive as to make an

15

environment hostile is a determination best left to the trier of fact.  *Nuness*, 325 F. Supp. 3d at 552; *see Cruz v. Trane Inc.*, No. 19-07324, 2022 WL 1442158, at *5 (D.N.J. May 5, 2022) (first citing *Taylor v. Metzger*, 706 A.2d 685, 691 (N.J. 1998) (noting that use of racial epithets is "regarded as especially egregious and capable of engendering a severe impact"); and then citing *Rios v. Meda Pharm., Inc.*, 252 A.2d 982, 989–90 (N.J. 2021)).

Plaintiff notes that one aggravating factor under element two is whether the harassment came from a supervisor.  (Opp. Br. at 12–13 (citing, *inter alia*, *Taylor*, 706 A.2d at 685 ("[T]he severity of the remark in this case was exacerbated by the fact that it was uttered by a supervisor.")))  To that end, Plaintiff claims—for the first time in his opposition brief—that Adkins was his supervisor.  (*Id.*)  But this argument is belied by both the record and Plaintiff's own testimony.[6]  And while severity of the harassment can be exacerbated if carried out by a supervisor, it is not required for vicarious liability.  *Nuness*, 325 F. Supp. 3d at 552–54 (denying defendant-employer's motion for summary judgment on plaintiff's hostile work environment claim where a co-worker called the plaintiff a racial epithet).

As for the third and fourth elements, Oxford and Atlantic assert Plaintiff was not detrimentally affected by the alleged comments, and that a reasonable person in like circumstances would not have been either.  (Ox. Mov. Br. at 16–17; Ox. Reply at 9 n.1; Atl. & King Mov. Br. at 27–29).  Oxford and Atlantic note that Plaintiff never complained about the alleged harassment and argue that Plaintiff could not have found the work environment to be abusive or hostile because he asked about an internship position for his daughter.  (Ox. Mov. Br. at 16; Atl. & King Mov. Br.

---

[6]     In his Amended Complaint, Plaintiff himself calls Adkins a "co-worker" while specifically noting that King "held a supervisory position . . . controlling many tangible aspects of Plaintiff's job duties, including holding the power to hire and fire Plaintiff."  (Am. Compl. ¶¶ 15 & 34).  Similarly, Plaintiff calls Adkins a "co-worker" in his EEOC charge and states that King "held supervisory authority over [him]" at all times.  (D.E. No. 49-15, Ex. M to McLane Cert. ¶ 24).

at 27).   Nonetheless, the Court finds that it is too early to answer the question whether Plaintiff was subjectively affected.   *See Mandel*, 706 F.3d at 169 ("Because the inherently subjective question of whether particular conduct was unwelcome presents difficult problems of proof and turns on credibility determinations, the District Court erred in granting summary judgment.").

Oxford and Atlantic also point to the testimony of Plaintiff's co-worker to support the argument that Adkins's comments would not have offended a reasonable person in like circumstances.  (*See generally* Ishaque Aff.; Atl. & King Br. at 28–29; Ox. Reply at 9 n.1).   The co-worker—who is similarly situated to Plaintiff as a Muslim—stated that she "understand[s] the word 'jihadi' to mean that a person struggles to do something."  (Ishaque Aff. ¶ 16).   In addition, she affirmed that she "do[es] not find this word offensive" and, "[i]n [her] opinion, it means fighting for your rights."  (*Id.*).   But this "evidence does not establish the non-existence of material issues of fact; to the contrary, it suggests there are disputes of material fact that must be resolved by a jury."  *See Dey*, 2022 WL 596977, at *7.

As to the fifth element, Oxford and Atlantic argue that they cannot be vicariously liable for Adkins's comments.  (Ox. Reply at 3–8; Atl. & King Br. at 29–31).   Whether an employer may be vicariously liable for the acts of its employee turns on whether the employee was a supervisor or merely a co-worker.  *Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013).   An employer may be strictly liable if the harasser was a supervisor.  *Id.*   If, however, the harasser was merely a co-worker, then a plaintiff must prove vicarious liability using traditional negligence and agency principles.  *Faragher*, 524 U.S. at 799; *Andreoli v. Gates*, 482 F.3d 641 (3d Cir. 2007) (internal quotations and citations omitted); *Streater v. City of Camden Fire Dep't*, 567 F. Supp. 2d 667, 676 (D.N.J. 2008); *Moore v. City of Phila.*, 461 F.3d 331, 349 (3d Cir. 2006).   Having already

determined that Adkins was Plaintiff's co-worker, the Court examines whether Oxford or Atlantic may be liable under traditional negligence and agency principles.

An employer may be held vicariously liable "where supervisors knew or should have known about the co-worker harassment but failed to take prompt and adequate remedial action to stop the abuse." *Moore*, 461 F.3d at 349 (cleaned up); *see Nuness*, 325 F. Supp. 3d at 554–55. Plaintiff asserts that he "explicitly and unequivocally objected to Adkins's discriminatory comments on a regular basis as they were made." (Opp. Br. at 21). In his supporting affidavit, Plaintiff claims he "complained to [his Oxford recruiter] regarding the discrimination [he] faced at Atlantic numerous times, well before [his] termination." (D.E. No. 52-1, Ex. A to Pl. Decl. ("Pl. Aff.") ¶ 68). Oxford and Atlantic counter, and the Court agrees, that this statement is controverted by the record evidence and by Plaintiff's own deposition testimony. (Ox. Reply at 14; Atl. & King Mov. Br. at 14).

During his deposition, Plaintiff testified that he allegedly spoke with Oxford employee Kaderavek several times. (D.E. No. 49-4, Ex. B to McLane Cert. ("Pl. Dep.") at 152:25–153:3). Yet Plaintiff testified that he could not recall complaining to her about Adkins's remarks, including the "bomb" and "jihadi" comments. (*Id.* at 151:19–52:3, 152:6–171:13 & 164:14–19). He mentioned "having trouble getting along with Mr. Adkins," but could not recall telling Kaderavek that it was related to his race, religion, or national origin. (*Id.* at 152:11–14 & 171:2–13). Similarly, Kaderavek testified that Plaintiff never complained to her about him being discriminated against by Adkins or anyone else at Atlantic. (D.E. No. 49-5, Ex. C to McLane Cert. at 15:20–16:15). Moreover, Plaintiff admitted that he never complained about discriminatory conduct to any Atlantic employee until *after* he was informed of the decision to end his assignment. (Pl. Dep. at 144:10–16). Thus, the record lacks evidence to support the notion that Oxford knew or should

18

have known about Adkins's allegedly discriminatory conduct.  For these reasons, Plaintiff cannot establish respondeat superior liability as to Oxford.  Thus, Oxford is entitled to summary judgment on Plaintiff's hostile work environment claims.

The same does not hold true, however, for Atlantic.  Plaintiff maintains that King overheard Adkins—from "a mere few feet" away—ask Plaintiff "[a]re you a jihadist?"  (Pl. CSUMF ¶¶ 16–17; Opp. Br. at 11).  In response, King allegedly smiled.  (Pl. CSUMF ¶ 17; Opp. Br. at 11).  Moreover, Plaintiff insists that Adkins regularly made other remarks at team meetings where supervisors were present.  (Pl. CSUMF ¶¶ 24–25; Opp. Br. at 15).  Thus, under Plaintiff's version of the facts, which the Court must view in the light most favorable to him as the non-movant, King or other supervisors either knew or should have known about Adkins's remarks and took no remedial action.  (*See* Opp. Br. at 11 & 15).  King, by contrast, emphatically denies ever hearing Adkins's alleged remarks.  (*See, e.g.*, Alt. & King SUMF ¶ 41).  Because this dispute raises a triable issue of fact, summary judgment in Atlantic's favor is improper.  *See, e.g.*, *Nuness*, 325 F. Supp. 3d at 552–54.  A jury must resolve Plaintiff's hostile work environment claims against Atlantic.

### ii.        *Counts III and VI against King*[7]

Plaintiff also attempts to hold King individually liable for Atlantic's conduct under Section 1981 and the NJLAD.  Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens" and that "the rights protected by this section are protected against impairment by nongovernmental discrimination."  42 U.S.C. §§ 1981(a)–(c).  Under

---

[7]        Although the Complaint appears to raise an NJLAD claim against all Defendants for aiding and abetting, the parties' papers only focus on whether King can be found liable for aiding and abetting.  (*See generally* Ox. Mov. Br. (omitting argument on aiding and abetting); Atl. & King Mov. Br. at 23–24; Opp. at 24–26).

Section 1981, an individual may only be liable if she "acted with 'purposeful discrimination' and was personally involved in the discrimination." *Brown*, 2016 WL 3951378, at * 4 (citing *Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261, 268 (3d Cir. 2010)).  A defendant may be "personally involved in the discrimination . . . if they intentionally caused the [employer] to infringe on [the plaintiff's] Section 1981 rights, or if they authorized, directed, or participated in the alleged discriminatory conduct." *Id.* (citing *Al-Khazraji v. Saint Francis Coll.*, 784 F.2d 505, 518 (3d Cir. 1986)).

As for the NJLAD, "individual liability of a supervisor for acts of discrimination or for creating or maintaining a hostile environment can only arise through the aiding and abetting mechanism." *Cicchetti v. Morris Cty. Sheriff's Office*, 194 N.J. 563, 594 (2008); *Emery*, 2021 WL 941879, at *10 ("In this regard, aiding and abetting liability is derivative: the NJLAD does not provide for individual liability if the employer is not found liable." (cleaned up)).  The NJLAD makes it unlawful "[f]or any person, whether an employer or an employee or not, to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under [the NJLAD], or to attempt to do so." N.J. Stat. Ann. § 10:5-12(e).  Indeed, "a supervisor has a duty under New Jersey law to act against harassment," and a "violation of this duty by either deliberate indifference or affirmative harassment subjects the supervisor to [NJ]LAD liability." *Cardenas v. Massey*, 269 F.3d 251, 269 (3d Cir. 2001).

As explained above, "[w]hether [King] was involved in, or deliberately indifferent to, many of the allegedly discriminatory actions contributing to the claimed hostile work environment is an issue of fact." *Id.*  The question whether King heard, authorized, participated, or acted deliberately indifferent to Adkins's alleged harassment towards Plaintiff is left to the jury. Accordingly, King's motion for summary judgment on Counts III and VI is denied.

**C.**      **Race Discrimination Claims: Count I (Title VII), Count III (Section 1981), and Count IV (NJLAD)**

To establish a *prima facie* case of race discrimination under the *McDonnell Douglas* burden-shifting framework, a plaintiff must prove (i) he belongs to a protected class; (ii) he was qualified for the position; (iii) the employer subjected him to an adverse employment action; and (iv) he was subjected to an adverse employment action under circumstances that raise an inference of discriminatory action.  *McLintock v. City of Philadelphia*, No. 20-3453, 2022 WL 395995, at *3 (3d Cir. Feb. 9, 2022) (first citing *Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008); and then citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).[8]  If the plaintiff establishes a *prima facie* case, the burden shifts to the defendant-employer to provide a legitimate, non-discriminatory reason for the adverse employment action.  *Johnson v. Keebler-Sunshine Biscuits, Inc.*, 214 F. App'x 239, 241 (3d Cir. 2007).  If the defendant-employer meets this burden, the plaintiff must then prove by a preponderance of evidence that the legitimate reason provided by the defendant-employer is simply a pretext for discrimination.  *Id.*  To show pretext, "a plaintiff must submit evidence which: (i) casts doubt on the legitimate reason proffered by the employer such that a factfinder could reasonably conclude that the reason was a fabrication; or (ii) allows the factfinder to infer that discrimination was more likely than not a motivating or determinative cause of the employee's termination."  *Id.* at 242.

Neither Plaintiff nor Defendants dispute the first two elements of a *prima facie* discrimination claim.  Under factors three and four, Plaintiff argues that King's comment—that

---

[8]      Race discrimination claims under Section 1981 and the NJLAD are governed by the same standard.  *Deans v. Kennedy House, Inc.*, 587 F. App'x 731, 734 n.3 (3d Cir. 2014); *Murphy v. Housing Auth. and Urban Redevelopment Agency*, 32 F. Supp. 2d 753, 763 (D.N.J. 1999) ("The prima facie elements of employment discrimination are the same for claims under Title VII and the NJLAD."); *see Brown*, 581 F.3d at 181–82 ("The substantive elements of a [racial discrimination] claim under § 1981 are generally identical to the elements of an employment discrimination claim under Title VII.").

the "whole team dynamic . . . is not working"—is evidence that Adkins's alleged discriminatory animus motivated Plaintiff's removal.  (Opp. Br. at 17–18).  Plaintiff also contends that his subsequent lack of re-assignment constituted an adverse employment action by Oxford.  (*Id.* at 20).  Oxford counters that because Atlantic ultimately "terminated" Plaintiff without any input from Adkins, Oxford did not take an adverse employment action.  (Ox. Reply at 11).  Atlantic argues that Plaintiff did not suffer an adverse employment action because Plaintiff was not terminated by his sole employer—*i.e.*, Oxford—and because he cannot establish that any action by Atlantic was taken with regard to his race, national origin, or religion.  (Atl. & King Mov. Br. at 12–13).

Regarding Oxford, other than the conclusory allegation that Adkins was a decision maker in his termination, Plaintiff has not proffered sufficient evidence to suggest that Oxford was involved in the decision to end his assignment with Atlantic.  (Pl. Aff. ¶ 8). As noted above, the record does not support Plaintiff's contention that Adkins acted as his supervisor.  Plaintiff's only allegation in support of this claim is that Adkins told him "[w]e don't want your kind of people around," a few hours prior to his termination.  (*Id.* ¶¶ 38–39).  This statement, even if true, is not evidence that Oxford participated in Plaintiff's termination.  Moreover, even if Oxford helped secure a replacement for Plaintiff prior to his termination, there is no evidence in the record to suggest that anyone at Oxford knew of the racial discrimination Plaintiff allegedly faced.

Plaintiff's other argument—that Oxford's alleged failure to reassign him to another consulting position also constituted an adverse employment action—is belied his own record testimony.  (Opp. Br. at 20).  During his deposition, Plaintiff admitted that he did not contact Oxford to seek another consulting assignment, although Oxford continued to email him regarding potential opportunities until the commencement of litigation.  (Pl. Dep. at 48:15–49:22).  As such,

the Court finds that Plaintiff has not made out a *prima facie* case for employment discrimination against Oxford.

As to Atlantic and King, the Court has already determined that a jury may find that Atlantic was a joint employer.  And while Plaintiff's termination is an adverse employment action, the Court finds that it did not occur under circumstances giving rise to an inference of discrimination. Plaintiff concedes he never complained of discrimination to any Atlantic employee until *after* he was informed of the decision to end his assignment.  (*Id.* at 144:10–16).  Furthermore, the Court finds unpersuasive Plaintiff's argument that King's statement regarding the "team dynamic" gives rise to an inference of discriminatory animus, particularly when Atlantic employed another Indian Muslim who worked with Plaintiff.  (Opp. Br. at 17–18; Ishaque Aff. ¶¶ 2 & 4–6).  Plaintiff's contention that this comment was made in reference to Adkins's remarks is purely speculative.[9] Relevant here, the Third Circuit has held that subjective beliefs that an employment decision is discriminatory are insufficient to survive summary judgment.  *See, e.g.*, *Ekhato v. Rite Aid*, 529 F. App'x 152, 156 (3d Cir. 2013).  Thus, the Court finds that summary judgment is warranted in Defendants' favor on Plaintiff's race discrimination claims.[10]

### D.      Retaliation Claims: Count II (Title VII) and Count V (NJLAD)

Title VII provides: "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an

---

[9]      For these reasons, Plaintiff has not presented sufficient evidence to survive summary judgment on his mixed-motive theory—that his race was a motivating factor in terminating his employment.  (*See* Opp. Br. at 17); *see also Tucker v. Thomas Jefferson Univ.*, 484 F. App'x 710, 713 (3d Cir. 2012) ("Mixed motive theory provides that discrimination exists if a plaintiff can show that race 'was a motivating factor for any employment practice.'" (quoting *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 101 (2003))); *Hajra v. Wawa, Inc.*, No. 15-7513, 2018 WL 565574, at *11 n.16 (D.N.J. Jan. 26, 2018).

[10]      Moreover, Plaintiff fails to rebut the legitimate, non-discriminatory reasons for his termination—*i.e.*, poor client relation skills and productivity issues.  Thus, there is no evidence that the proffered reasons for Plaintiff's termination were pretextual in nature.  Finally, it follows that King cannot be liable for aiding and abetting racial discrimination under Count VI.

unlawful employment practice by this subchapter."  42 U.S.C. § 2000e-3(a).  As in hostile work environment and discrimination claims, the *prima facie* case for retaliation is the same under Title VII and the NJLAD.  *Compare McKinnon v. Gonzales*, 642 F. Supp. 2d 410, 424 (D.N.J. 2009) (listing Title VII retaliation *prima facie* elements), *with Cohen v. BH Media Grp., Inc.*, 419 F. Supp. 3d 831, 861 (D.N.J. 2019) (listing NJLAD retaliation *prima facie* elements).

To establish a *prima facie* retaliation case, a plaintiff must prove (i) he engaged in a protected activity; (ii) the employer took an adverse employment action against him; and (iii) a causal connection exists between the protected activity and the adverse employment action. *Moore*, 461 F.3d at 340–41.  "With respect to 'protected activity,' the anti-retaliation provision protects those who . . . oppose discrimination made unlawful by Title VII."  *Id.*  The employee must also unequivocally oppose the discrimination. *Barber v. CSX Distrib. Servs.*, 68 F.3d 694, 702 (3d Cir. 1995).

Having already determined that Plaintiff did not report the alleged discrimination to either Oxford or Atlantic, the Court necessarily finds that Plaintiff did not engage in a protected activity. Accordingly, Plaintiff's *prima facie* retaliation claims against Defendants fail.[11]

## IV.   CONCLUSION

For the forgoing reasons, Oxford's motion for summary judgment is GRANTED and Atlantic and King's motion for summary judgment is GRANTED in-part and DENIED in-part. An appropriate Order accompanies this Opinion.

**Dated:** June 7, 2022                                      s/*Esther Salas*
                                                            Esther Salas, U.S.D.J.

---

[11]     It follows that King cannot be liable for aiding and abetting retaliatory conduct under Count VI.